Russell BOLDEN, Appellant
in No. 90–1478

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Appellant in 90–1435,**

v.

**TRANSPORT WORKERS UNION OF PHILADELPHIA, LOCAL 234, TRANSPORT WORKERS UNION OF AMERICA AFL/CIO, Appellee/Cross-Appellant.**

Nos. 90–1435, 90–1478.

United States Court of Appeals,
Third Circuit.

Argued Jan. 8, 1991.

Reargued In Banc Oct. 9, 1991.

Decided Dec. 31, 1991.

H. Francis deLone, Jr. (argued), Philadelphia, Pa., for Russell Bolden.

John F. Smith, III, Richard S. Meyer (argued), Virginia H. Miller, Thomas E. Groshens, Barbara Shotel, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Southeastern Pennsylvania Transp. Authority.

Originally Argued Jan. 8, 1991.

Before: COWEN, ALITO and ROSENN, Circuit Judges.

Reargued In Banc Oct. 9, 1991.

Before SLOVITER, Chief Judge and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and ROSENN,* Circuit Judges.

OPINION OF THE COURT

ALITO, Circuit Judge:

The Southeastern Pennsylvania Transportation Authority ("SEPTA") appeals from a judgment awarding compensatory damages to Russell Bolden, a former SEPTA maintenance custodian, based on an assertedly unconstitutional drug test that resulted in Bolden's discharge. Bolden also appeals, contending that the district court improperly dismissed his claim for punitive damages. We will affirm the district court judgment insofar as it holds that SEPTA is liable for violating Bolden's constitutional right against unreasonable search, but we will reverse the award of

---

* Hon. Max Rosenn, Senior Judge, participated as a member of the original panel.

compensatory damages and will remand the case for a new trial on that issue. We will also affirm the dismissal of Bolden's claim for punitive damages.

### I.

Bolden was a maintenance custodian at SEPTA's Fern Rock Depot from 1981 to 1986. In August 1986, Bolden was involved in an altercation with a SEPTA bus driver and was discharged for conduct unbecoming a SEPTA employee. Bolden's union, the Transportation Workers' Union Local 234 ("Local 234"), filed a grievance, which was denied by SEPTA and ultimately submitted for arbitration pursuant to the collective bargaining agreement. In June 1987, the arbitration panel ordered that Bolden be reinstated with one-half back pay.

In the meantime, SEPTA had unilaterally implemented a new drug testing policy.[1] In January 1987, SEPTA promulgated Order No. 87–1, which called for random testing of certain employees. On February 3, 1987, SEPTA promulgated Order 87–2, the order at issue in this case. Order 87–2 authorized drug testing of employees returning to work after certain absences, including any disciplinary suspension or any absence of more than 30 days.[2] The unions that represent SEPTA workers, including Local 234, filed an action in the Eastern

District of Pennsylvania challenging the legality of SEPTA's new policy. On February 9, 1987, the district court issued a preliminary injunction against enforcement of Order 87–1 but not Order 87–2.[3] After some modification of the random-testing program, the district court held in January 1988 that this program met Fourth Amendment standards but that the return-to-work testing requirement was unconstitutional. *Transport Workers' Local 234 v. SEPTA,* 678 F.Supp. 543 (E.D.Pa.1988).

We affirmed both of these holdings. *Transport Workers' Local 234 v. SEPTA,* 863 F.2d 1110 (3d Cir.1988), *vacated,* 492 U.S. 902, 109 S.Ct. 3208, 3209, 106 L.Ed.2d 560 (1989), *reaffirmed,* 884 F.2d 709 (3d Cir.1989).[4] With respect to return-to-work testing, we wrote (*id.* at 1122):

> SEPTA must justify its return-to-work testing on the basis of some particularized suspicion. It has, however, failed to present any evidence that the employees returning to work present some unique risk directly related to drug or alcohol use. Thus, SEPTA has not shown that this aspect of its program is initially justified or that testing of all employees returning after an absence for whatever cause has any relationship to the articulated need for the program.

As noted above, the arbitrators' decision requiring Bolden's reinstatement was is-

---

1. The background and details of this policy are discussed in our opinion in *Transport Workers' Local 234 v. SEPTA,* 863 F.2d 1110, 1113–15 (3d Cir.1988), *vacated,* 492 U.S. 902, 109 S.Ct. 3208, 3209, 106 L.Ed.2d 560 (1989), *reaffirmed,* 884 F.2d 709 (3d Cir.1989).

2. SEPTA Order 87–2 provided in relevant part:

 Any employee returning to work under the following circumstances may be subject to a medical examination, including body fluid testing: 1. Absences due to physical problems such as injury occurring on or off duty, and illness; 2. A rehabilitation program for substance abuse which lasted for any length of time; 3. a disciplinary suspension; 4. Any other approved absence from duty in excess of 30 days. (excluding a five-week vacation period).

 Refusal to submit to the aforementioned medical examination will subject employees to the disciplinary measures outlined under policy 85–1.

App. at 980.

3. Although the district court's later reported opinion stated that Order 87–2 had also been preliminarily enjoined (*see Transport Workers, Local 234,* 678 F.Supp. 543, 547 (E.D.Pa.1988)), the same district court judge made clear in this case that the preliminary injunction applied only to Order 87–1. *See* 10/20/89 Order–Memorandum at 3 & n. 3.

4. The Supreme Court vacated our decision and remanded for reconsideration in light of its subsequent decisions in *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *Consolidated Rail Corp. v. Railway Labor Executives Ass'n,* 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). On remand, we reaffirmed the portion of our decision that had upheld SEPTA's testing program for safety-sensitive positions, but we had no occasion to address the return-to-work question because SEPTA chose to abandon that issue. 884 F.2d at 711 n. 1.

sued in June 1987, more than six months before the district court permanently enjoined enforcement of Order 87–2. Since Bolden had missed work due to a disciplinary suspension and had been absent for more than 30 days, he was directed under Order 87–2 to submit to a medical examination, including body fluids testing, before returning to work. Bolden underwent a two-hour medical examination during which a blood sample was taken. He also provided a urine sample in private. These samples were sent to a laboratory for testing, and the results were interpreted by SEPTA to mean that Bolden had used marijuana. Thus, in August 1987, Bolden was again discharged, this time for drug use in violation of SEPTA Order 85–1.[5]

Once again, Local 234 filed a grievance, represented Bolden through three levels of grievance proceedings, and requested arbitration. Prior to arbitration and after enforcement of Order 87–2 was permanently enjoined in January 1988, SEPTA and the union reached a settlement of the grievance regarding Bolden's discharge. Under this settlement, Bolden was to receive full back pay for the second part of the discharge period, but he was required to comply with one of two options. He could 1) enter SEPTA's Employee Assistance Program and present evidence of successful substance abuse treatment, agree to an "aftercare program," submit to a body fluids test before returning to work, and remain subject to unannounced follow-up tests or 2) submit to a body fluids test and, if he passed, meet with a substance abuse counsellor and remain subject to unannounced follow-up testing for six months. Thus, both options required Bolden to submit to a drug test before returning to work and to remain subject to testing for a period thereafter. Bolden did not comply with either option and consequently did not resume work.

Instead, Bolden filed a complaint against SEPTA under 42 U.S.C. § 1983, alleging that SEPTA had violated his constitutional rights by subjecting him to an unreason-able search and seizure and by discharging him without a prior hearing. His complaint sought both compensatory and punitive damages. SEPTA filed an answer denying that the drug test was unconstitutional and asserting the affirmative defense of accord and satisfaction based on the settlement of the second grievance. SEPTA later filed a third-party complaint against Local 234, claiming that the union was liable for any recovery obtained by Bolden since the union had negotiated the settlement with SEPTA. Bolden, in turn, filed an amended complaint that added Local 234 as a defendant. In this amended complaint, Bolden asserted that "[i]f ... Local 234 ... had any obligation to represent plaintiff in connection with this illegal drug testing and illegal discharge, which obligation is denied by plaintiff, then Local 234 participated in a conspiracy with [SEPTA] to deprive plaintiff of his XIVth Amendment rights." According to the amended complaint, Local 234 furthered this conspiracy by failing to file a Section 1983 action on his behalf, failing to insist on arbitration within the time required by the collective bargaining agreement, and accepting an unsatisfactory settlement.

The district court denied Bolden's and SEPTA's cross-motions for summary judgment on liability, holding that there were genuine issues of material fact with regard to whether the drug test was reasonable, whether Bolden had consented to the test, and whether accord and satisfaction based on the settlement could be shown. The court did, however, dismiss Bolden's claim for punitive damages under *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The court also granted Local 234's unopposed motion for summary judgment on SEPTA's third-party complaint.

Bolden's claims against SEPTA and Local 234 were tried before a jury for eight days in March 1990. In response to interrogatories, the jury found that SEPTA had violated Bolden's right to be free from un-

---

**5.** Order 85–1 is discussed in *Transport Workers,' Local 234 v. SEPTA*, 678 F.Supp. 543, 545 & n. 4 (E.D.Pa.1988).

reasonable searches and seizures and found that his damages for this violation were $285,000. The jury found that SEPTA had not violated Bolden's right to procedural due process and that Local 234 had not violated Bolden's constitutional rights by conspiring with SEPTA. The district court denied SEPTA's motion for judgment notwithstanding the verdict and entered judgment in favor of Bolden for the amount of the verdict. Both SEPTA and Bolden appealed.

In the briefs filed by SEPTA before the panel argument, SEPTA contended that Bolden's drug test was reasonable because his duties posed a substantial risk of harm to himself and others and because Bolden had consented to the test. SEPTA also relied upon the settlement it reached with Local 234 after Bolden's discharge for drug use. Finally, SEPTA contended that the judgment for $285,000 was contrary to law, excessive, and unconscionable. Bolden argued that the district court erred in dismissing his claim for punitive damages.

A panel of this court issued a judgment reversing the district court and remanding for entry of judgment in favor of SEPTA. Bolden's petition for rehearing was subsequently granted, and the judgment of the panel was vacated.

## II.

Before turning to the arguments made by the parties in the briefs submitted prior to the initial panel argument, we first address an issue that was originally raised by the panel at oral argument, *viz.*, whether SEPTA may be sued in federal court under Section 1983. The parties addressed this question in letter-briefs submitted after the panel argument and in supplemental briefs submitted after rehearing was granted. Relying on the Supreme Court's reasoning in *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), SEPTA contends that it is an alter ego of the Commonwealth of Pennsylvania for Eleventh Amendment purposes and that it therefore may not be sued in federal court without its consent. SEPTA also argues that, because it is not subject to suit

in federal court by virtue of the Eleventh Amendment, it is also not a "person" within the meaning of 42 U.S.C. § 1983.

■ Before addressing the merits of this Eleventh Amendment argument, we must consider whether we should reach this issue, since it was never raised by SEPTA at any time prior to the oral argument before the panel. We do not generally consider issues not raised by the parties (*see Frank v. Colt Indus., Inc.*, 910 F.2d 90, 100 (3d Cir.1990)), but we are always obligated to ensure that we have jurisdiction over the cases that come before us. *Mansfield, Coldwater & Lake Michigan R.R. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). "[T]he Eleventh Amendment sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court" in order to be preserved for appeal. *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974); *see also Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). The Supreme Court has held, however, that the Eleventh Amendment defense is not "jurisdictional in the sense that it must be raised and decided by [the] Court on its own motion." *Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 516 n. 7, 102 S.Ct. 2557 n. 7, 73 L.Ed.2d 172 (1982). Instead, the Court has suggested that when an Eleventh Amendment question is not raised by the parties, the Court may determine whether to raise and decide the question based on what is "appropriate" in each particular case. *Id.* *See also Alessi v. Commonwealth of Pa. Dep't of Pub. Welfare*, 893 F.2d 1444, 1455 n. 5 (3d Cir.1990) (Becker, J., concurring and dissenting).

■ In light of *Patsy*, we conclude that it is appropriate to reach the Eleventh Amendment issue in this case. In some cases in which an Eleventh Amendment issue is not raised in the district court, a lack of relevant evidence in the district court record might impede us from deciding the issue, but this problem is not present here. As discussed in Part II.F. of this opinion, the only factual question bearing on our Eleventh Amendment analysis

in this case concerns the percentage of SEPTA's funds provided by the Commonwealth and other sources. While these statistics are not in the record of this case, SEPTA provided these figures to the district court in *Frazier v. SEPTA*, Nos. 84–2950 & 84–3004, 1990 WL 82087 (E.D.Pa. June 11, 1987), a recent case in which SEPTA claimed that it was entitled to Eleventh Amendment protection. Both parties' *in banc* briefs rely on these statistics; and although Bolden was not a party in *Frazier*, Bolden's counsel stated during oral argument before the *in banc* court that he did not object to our relying upon those same facts. Consequently, it is appropriate for the *in banc* court to decide the important Eleventh Amendment question that is presented in this case.

■ B. The case now before us is only the most recent in a long string of cases in which we have considered the Eleventh Amendment's application to a variety of governmental and semi-governmental entities. Just two and a half years ago, sitting *in banc* in *Fitchik v. New Jersey Transit Rail Operations*, 873 F.2d 655 (3d Cir. 1989), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989), we held that the Eleventh Amendment did not apply to the agency created by the State of New Jersey to provide public transportation following the demise or decline of many of the privately owned railroads and bus companies serving the state. *See* N.J.S.A. § 27:25–1 et seq. In this case, we consider whether the Eleventh Amendment applies to the entity created by the Commonwealth of Pennsylvania to provide public transportation following the demise or decline of many of the privately owned transportation companies serving southeastern Pennsylvania. In *Fitchik*, we applied essentially the same mode of analysis employed in cases previously decided by this court. *See Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. and N.J.*, 819 F.2d 413 (3d Cir.), *cert. denied*, 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987); *Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303 (3d

Cir.1987); *Blake v. Kline*, 612 F.2d 718 (3d Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980); *Urbano v. Board of Managers*, 415 F.2d 247 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970). Because we are sitting *in banc* in this case, we are not bound by these precedents in the same way that a panel would be bound. *See* Internal Operating Procedures 9.1. Instead, we are constrained only to the degree counselled by principles of stare decisis. Before discussing these prior decisions, therefore, we turn to the fundamental Eleventh Amendment principles on which they were based.

C. The Eleventh Amendment provides: The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of any Foreign State. Despite this wording, the Supreme Court has interpreted the Amendment to protect an unconsenting state from "suit in federal court by its own citizens as well as those of another state." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). The Supreme Court has also held that the Eleventh Amendment applies to claims asserted in federal court under 42 U.S.C. § 1983. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

Two additional propositions established in the Supreme Court's Eleventh Amendment decisions are important for present purposes. First, although political subdivisions of a state, such as counties and municipalities, fall within the term "State" as used in the Fourteenth Amendment,[6] political subdivisions are not "State[s]" under the Eleventh Amendment. In *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890), the Court held:

---

6. *See, e.g., Monell v. Department of Social·Services of the City of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (actions of local

governments may violate individuals' constitutional rights against the states and give rise to causes of action under Section 1983).

The Eleventh Amendment limits the jurisdiction only as to suits against a State.... [W]hile the county is territorially part of the State, yet politically it is also a corporation created by and with such powers as are given to it by the State. In this respect it is a part of the State only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the State.

See also *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

The second important principle is that the Eleventh Amendment "bars suits in federal court 'by private parties seeking to impose a liability which must be paid from public funds in the state treasury.'" *Hafer v. Melo,* —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), *quoting Edelman,* 415 U.S. at 663, 94 S.Ct. at 1355. In *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), the Court held that the Eleventh Amendment barred a tax refund suit against the Indiana governor, treasurer, and auditor, "who 'together' constituted the board of the Department of Treasury." *Id.* at 460, 65 S.Ct. at 349. The Court held that this suit "constitute[d] an action against the State of Indiana" because the judgment sought would be "satisfied by funds in the state treasury." *Id.* at 463, 65 S.Ct. at 350. In *Edelman,* this principle was held to apply even if the relief was labelled "equitable."

The Supreme Court has relied on these principles in deciding whether an entity is an alter ego of a state for Eleventh Amendment purposes. In *Mt. Healthy,* the Court held (429 U.S. at 280–81, 97 S.Ct. at 572–73) that a local board of education was "more like a county or city than it [was] like an arm of the State" and was therefore not entitled to Eleventh Amendment protection. This conclusion rested "at least in part, upon the nature of the entity created by state law," but the Court also considered the board's autonomy from state control and its actual and potential sources of income (*id.* at 280, 97 S.Ct. at 572). The Court noted (*id.*) that the board was "subject to some guidance from the State Board of Education and receive[d] a significant amount of money from the State," but that under state law it possessed "extensive powers to issue bonds and to levy taxes."

In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), the Court considered the status of an agency created by interstate compact to exercise land use powers in a region straddling the two states. The Court reasoned (440 U.S. at 401, 99 S.Ct. at 1177) that "[i]f an interstate compact discloses that the compacting States created an agency comparable to a county or municipality, which has no Eleventh Amendment immunity, the Amendment should not be construed to immunize such an entity." Holding that the Amendment did not apply to the entity in question, the Court stated (*id.* at 401–02, 99 S.Ct. at 1177–78) that most of the governing members of the agency were appointed by local governments; that the agency was funded by counties, not the states; and that the agency's obligations were not binding on the states (*id.* at 402, 99 S.Ct. at 1177). The Court observed (*id.* at 401, 99 S.Ct. at 1177) that the states had disclaimed any intent to confer immunity, and that the function of the agency, regulation of land use, was "traditionally a function performed by local governments" (*id.* at 402, 99 S.Ct. at 1177).

D. Even before *Mt. Healthy* and *Lake Country Estates,* our decisions relied on essentially the same factors as the Supreme Court did in those cases. In *Urbano* (415 F.2d at 250–51), we consulted the following factors set out in *Krisel v. Duran,* 258 F.Supp. 845, 849 (S.D.N.Y.1966), *aff'd,* 386 F.2d 179 (2d Cir.1967), *cert. denied,* 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968): [7]

* * * [L]ocal law and decisions defining the status and nature of the agency in-

---

7. In *Urbano,* we ultimately found that abstention was appropriate, and therefore we did not decide whether the agency involved in that case, the Board of Managers of the New Jersey State Prison, was protected by the Eleventh Amendment. *See* 415 F.2d at 1253–58.

volved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance.

Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.

In *Blake v. Kline,* 612 F.2d 718 (3d Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980), we relied on *Urbano* in considering whether the Pennsylvania Public School Employees' Retirement Board could successfully raise the Eleventh Amendment defense. Because we found that the district court should have permitted discovery and held a hearing before ruling on the issue, we remanded for further proceedings.[8] 612 F.2d at 727.

In *Port Auth. Police Benevolent Assoc. v. Port Auth. of N.Y. and N.J.,* 819 F.2d 413 (3d Cir.1987), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987), we considered whether the Port Authority enjoyed Eleventh Amendment protection. We relied on *Lake Country Estates* as well as the *Urbano* factors in finding that the Port Authority could invoke this defense. We concluded (819 F.2d at 415) that the states that created the authority intended that it be considered a state agency for Eleventh Amendment purposes. We also concluded (*id.* at 418) that a judgment against the Authority could affect the state treasuries, since a provision in the compact mandated state contribution to the Authority unless its revenues were "adequate to meet all expenditures." We noted (*id.* at 417) that the Authority was not autonomous because the governors appointed the Authority's commissioners and because the governors and legislatures retained substantial power over Authority actions. We also observed (*id.* at 418) that the Authority was exempt from state taxation. Although the Authority possessed the power to sue and be sued, this was insufficient to persuade us that the Authority was not an arm of the state.[9]

In *Kovats v. Rutgers, the State Univ.,* 822 F.2d 1303 (3d Cir.1987), we found that Rutgers was not an alter ego of the state. Although the university was, in part, state-created and received "a large degree of state funding," we noted (*id.* at 1312) that it was "independent" and "direct[ed] its own actions." Perhaps most importantly,

---

**8.** Although our decision in *Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53, 62 (3d Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976), might suggest that state law characterization is the only relevant consideration in determining if an agency is entitled to raise the Eleventh Amendment defense, such a reading would be in error. State law extending sovereign immunity to an agency is relevant to the Eleventh Amendment determination (*see Skehan,* 538 F.2d at 62, citing state law determination of sovereign immunity in *Brungard v. Hartman,* 12 Pa.Cmwlth. 477, 315 A.2d 913 (Pa.Commw.Ct.1974)), but it is not dispositive. In *Brungard,* the plaintiff alleged state ownership and operation of the agency. 315 A.2d at 914. In *Skehan,* the agency was not separately incorporated. *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3d Cir.1974), *vacated on other grounds,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), *on remand,* 538 F.2d 53 (3d Cir.1976). Thus, a state law determination of sovereign immunity may coincide with and influence the federal law determination of Eleventh Amendment status, but the former does not conclusively determine the latter.

**9.** The Supreme Court subsequently held that, if the Port Authority was otherwise eligible to raise the defense, New York and New Jersey had waived the Eleventh Amendment defense in the compact by expressly consenting to suit against the Authority in federal court. *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990).

we stated (*id.* at 1312) that Rutgers was "responsible on its own for judgments resulting from [its] actions." We wrote (*id.* at 1309): "Rutgers has substantial amounts of non-state funds in both commingled and segregated accounts out of which a judgment can be paid.... Rutgers retains sole discretionary control over both its commingled and segregated accounts, subject only to audit by the state.... Thus, a judgment against Rutgers can be paid from non-state funds under Rutgers' discretionary control." We noted (*id.* at 1309) that the state might choose to increase funding of the university if the university paid a judgment that reduced the non-state funds available for its educational activities. But we distinguished Rutgers from the Port Authority since the state had no statutory obligation to provide funding to Rutgers under that circumstance. We wrote (*id.* at 1309): "Any increase in Rutgers' state appropriations as a result of a judgment against Rutgers will be entirely the result of discretionary action by the state."

In *Fitchik*, 873 F.2d at 659 (footnote omitted), we condensed the *Urbano* factors into three larger questions:[10]

1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors—whether payment will come from the state treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue and be sued in its own right, and whether it is immune from state taxation);

3) What degree of autonomy the agency has.

In addition, we reiterated (*id.*) that the most important question was "whether any

judgment would be paid from the state treasury." Applying these factors to New Jersey Transit—an entity that, as discussed below (*see* Part II.F. *infra*), is strikingly similar to SEPTA—we concluded that the Eleventh Amendment did not apply.

E. Nothing convinces us to abandon the approach taken in *Urbano, Blake, Port Auth. Police, Kovats,* and *Fitchik.* SEPTA argues that the Supreme Court's decision in *Will v. Michigan Dep't of State Police, supra* "must be taken to alter the calculus otherwise required by [*Fitchik*] and like cases." SEPTA's In Banc Brief at 5–6. "Without necessarily concluding that state law immunity has acceded to a controlling position ...," SEPTA asserts (*id*), "such an analysis must now accord far more weight to that factor."

This interpretation of *Will*—a decision that "[m]ost certainly ... did not rest directly on the Eleventh Amendment" (*Melo v. Hafer*, —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991))—is patently incorrect. In *Will*, the Supreme Court held that a state is not a "person" within the meaning of Section 1983. The Court provided essentially three reasons for this conclusion. First, the Court relied (491 U.S. at 64–66, 109 S.Ct. at 2308–09) on the language of Section 1983 and the meaning of the word "person." Second, the Court reasoned (491 U.S. at 66–67, 109 S.Ct. at 2309–10) that Section 1983 was enacted to provide "a federal forum to remedy many deprivations of civil liberties" and that, since an unconsenting state could not be sued in federal court by virtue of the Eleventh Amendment, Congress could not have intended for Section 1983 to provide a claim that could be asserted against a state. Third, the Court noted (491 U.S. at 67, 109 S.Ct. at 2309) that states enjoyed sovereign immunity from suit under common law, and that Section 1983 was not intended to override "well established immunities or defenses under common law."

No portion of this reasoning supports SEPTA's position in this case. (For

---

**10.** *Fitchik* eliminated one factor—the distinction between governmental and proprietary functions—in light of *Garcia v. San Antonio Metro.*

*Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

present purposes, it is convenient to change the order in which these reasons are discussed.) The first reason cited in *Will*—the language of Section 1983 and the meaning of the term "person"—is relevant only in construing Section 1983, not in determining the scope of the Eleventh Amendment. Moreover, SEPTA does not claim that it does not fall within the contemporary legal usage of the term "person." Indeed, the "Dictionary Act" (the Act of Feb. 25, 1871 § 2, 16 Stat. 431), which was quoted by both the *Will* majority (491 U.S. at 69, 109 S.Ct. at 2310) and the dissent (*id.* at 78, 109 S.Ct. at 2315 (Brennan, J., dissenting)), defined the term "person" as generally applying to "bodies politic and corporate," a phrase that meant "both private and public (municipal)" corporations. *Id.* at 69, 109 S.Ct. at 2310. Since SEPTA is a "separate body corporate and politic" (55 Pa.Stat. Ann. § 600.303(a)), it falls squarely within this definition.

██ The third reason cited in *Will*—that Section 1983 was not intended to override well-established common law immunities—likewise does not support SEPTA's claim that it is entitled to Eleventh Amendment immunity. Even if entities like SEPTA enjoyed sovereign immunity under common law and were likewise immune from Section 1983 claims, it would not follow that those entities would be entitled to Eleventh Amendment protection. *Will* concluded that "the scope of the Eleventh Amendment is a consideration" when "deciphering congressional intent as to the scope of § 1983" (491 U.S. at 66–67, 109 S.Ct. at 2309–10). It clearly would be illogical, however, to reason in the opposite direction, i.e., to rely on the scope of § 1983, a statute whose predecessor was enacted in 1871, in attempting to determine the meaning of the Eleventh Amendment, a constitutional provision adopted in 1798.

The second reason cited in *Will*—that Section 1983 was not intended to create a cause of action that would be barred in federal court by the Eleventh Amendment—also provides no assistance to SEPTA. Unless SEPTA can show that it is entitled to Eleventh Amendment protec-

tion, this portion of the *Will* analysis has no application here; and for the reasons just discussed, *Will* furnishes no basis for concluding that SEPTA enjoys Eleventh Amendment protection.

SEPTA's argument with respect to *Will* is essentially as follows: (1) *Will* recognized that Section 1983 was not meant to override common law immunities recognized in 1871; (2) SEPTA now enjoys limited sovereign immunity under the Pennsylvania Sovereign Immunity Act enacted in 1978 and amended in 1980; (3) therefore SEPTA should not be suable under Section 1983; (4) and therefore SEPTA is protected by the Eleventh Amendment. This reasoning is plainly unsound. SEPTA's immunity under a 1978 state statute obviously reveals nothing about the intended scope of Section 1983's predecessor, which was enacted in 1871. And even if SEPTA could not be sued under Section 1983 (like municipalities prior to *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), it would not follow that SEPTA should be regarded as a "State" under the Eleventh Amendment (any more than a municipality was viewed as a "State" for this purpose before *Monell*).

██ Acceptance of SEPTA's interpretation of *Will* would revolutionize the meaning of the Eleventh Amendment. SEPTA's position is that the Pennsylvania Sovereign Immunity Act conferred Eleventh Amendment protection upon SEPTA. As stated in the caption of part IA of its *in banc* brief (at 6), SEPTA maintains: "The Pennsylvania Supreme Court and This Court Have Held That SEPTA Is a Commonwealth Agency Immune From Suit Under the Pennsylvania Sovereign Immunity Act, Which Conclusion Renders SEPTA Immune From Suit Under the Eleventh Amendment." If this reasoning were accepted, each state legislature apparently could confer Eleventh Amendment protection on any entity it wished, including counties and cities, by enacting a statute clothing these entities with "sovereign immunity" from suit on state claims. We are confident that *Will* was not intended to permit anything

of this sort. Thus, we do not believe that *Will* requires any alteration in the Eleventh Amendment analysis employed in *Fitchik* and our earlier cases.

We note that the Supreme Court rejected a similar argument in *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990), decided after *Will*. In *Howlett*, the Court made clear that *federal* law determines who is a "person" under § 1983, *id.* 110 S.Ct. at 2442, 2443–44. Additionally, in rejecting a Florida law that extended immunity from state court actions under § 1983 not only to the state and its arms, but also to municipalities, counties, and school districts otherwise subject to suit under § 1983, the Court stated (*id.* 110 S.Ct. at 2446–47 (citations omitted) (emphasis added)):

> Congress did take common law principles into account in providing certain forms of absolute and qualified immunity and in excluding States and arms of the State from the definition of person. But as to persons that Congress subjected to liability, individual States may not exempt such persons from federal liability by relying on their own common law heritage. *If we were to uphold the immunity claim in this case, every State would have the same opportunity to extend the mantle of sovereign immunity to "persons" who would otherwise be subject to § 1983 liability. States would then be free to nullify for their own people the legislative decisions that Congress has made on behalf of all the People.*

The decisions of other courts of appeals in analogous cases fortify our decision to retain the mode of analysis used in our earlier cases. Most of these decisions have emphasized that the most important factor is whether any judgment would have to be paid from the state treasury, but these decisions have also considered, to varying degrees, the state law characterization of the entity, the source of funding, the degree of functional autonomy, the power of the agency to sue and be sued and to enter into contracts, immunity from state taxation, and the state's responsibility under state law for the agency's operations. *See*

*Puerto Rico Ports Auth. v. M/V MAN-HATTAN PRINCE*, 897 F.2d 1 (1st Cir. 1990); *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499 (11th Cir.1990); *Feeney v. Port Auth. Trans–Hudson Corp.*, 873 F.2d 628 (2d Cir.1989), *aff'd*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198 (9th Cir.), *cert. denied*, 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1988); *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir.1988); *Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218 (D.C.Cir.1986); *Foremost Guar. Corp. v. Community Sav. & Loan, Inc.*, 826 F.2d 1383 (4th Cir.1987); *Jensen v. State Bd. of Tax Comm'rs of the State of Ind.*, 763 F.2d 272 (7th Cir.1985); *Greenwood v. Ross*, 778 F.2d 448 (8th Cir.1985); *Hall v. Medical College of Oh. at Toledo*, 742 F.2d 299 (6th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985). The same criteria have been employed in determining the status of various transportation authorities that are similar to SEPTA in character, although different in some details. *See Feeney, supra; Sanders v. Washington Metro. Area Transit Auth.*, 819 F.2d 1151 (D.C.Cir.1987); *Morris, supra; Feary v. Regional Transit Auth.*, 685 F.Supp. 137 (E.D.La.1988); *Weide v. Mass Transit Admin.*, 628 F.Supp. 247 (D.Md.1985); *Morrison–Knudsen Co. v. Mass. Bay Transp. Auth.*, 573 F.Supp. 698 (D.Idaho 1983).

▪ In sum, we conclude that SEPTA's entitlement to Eleventh Amendment protection should be decided based on *Fitchik* and on earlier cases. We will therefore turn to that analysis.

F. 1. *Funding.* As previously noted, our prior cases have held that the "most important" factor is "whether any judgment would be paid from the state treasury." *Fitchik*, 873 F.2d at 659; *see also Urbano*, 415 F.2d at 251. In *Fitchik*, we found that this factor provided an "extremely strong indication that [New Jersey Transit was] not the alter ego" of the state, and this factor weighs at least as heavily against SEPTA here.

In *Fitchik,* 873 F.2d at 660 (emphasis in original), we wrote that "[t]he most striking financial detail is that NJT's money does *not* come predominately from the state." Instead, New Jersey provided "less than 33% of NJT's operating funds" (*id.*). Here, the figures on which SEPTA relies show that only about 27% of its revenues came from the state government.[11] The remainder came from federal and local subsidies (14%), fares (54%), and other sources (5%). Thus, this most important fact weighs more heavily against SEPTA than it did against New Jersey Transit.

In *Fitchik,* we also relied (873 F.2d at 661) on the fact that "New Jersey [was] under no obligation to pay NJT's debts or reimburse NJT for judgments that it pays." "Indeed," we added (*id.*), "New Jersey has specifically disclaimed any liability for NJT's debts." These words apply equally to SEPTA. SEPTA has "no power ... to pledge the credit or taxing power of the Commonwealth," its obligations may not "be deemed to be obligations of the Commonwealth," and the Commonwealth is not "liable for the payment of principal or interest on such obligations." 1991 Pa. Laws 26, § 1503(21); 55 Pa.Stat.Ann. § 600.303(d)(20) (1991 Supp.).

Furthermore, SEPTA, like NJT, need not "request funds from the state coffers in order to meet shortfalls caused by adverse judgments." *Fitchik,* 873 F.2d at 661. Rather, SEPTA, like NJT and "like a private railroad, ... can raise revenues by raising fares" (*id.*). *See* Act 26 § 1503(9) (SEPTA's authority to set fare and services); 55 Pa.Stat.Ann. § 600.303(d)(9) (Purdon 1991 Supp.) (same). And like NJT

(*Fitchik,* 873 F.2d at 661), SEPTA may purchase insurance or self-insure. Act 26, § 1503(25); 55 Pa.Stat.Ann. § 600.-303(d)(24) (Purdon 1991 Supp.).

■ SEPTA contends that it might be unable to make up a significant shortfall by raising fares and thus might be compelled to rely on increased state subsidies. We rejected a similar argument, however, in *Fitchik,* 873 F.2d at 661 and *Kovats,* 822 F.2d at 1309. In *Fitchik,* we wrote (873 F.2d at 661): "Although New Jersey might appropriate funds to NJT to meet any shortfall caused by judgments against NJT, such voluntary payments by a state do not trigger [Eleventh Amendment] immunity." A state legislature might feel compelled as a practical matter to subsidize a variety of entities that provide necessary services, including financially pressed municipalities. Such discretionary subsidies committed in reaction to a judgment, however, would not necessarily transform the recipients into alter egos of the state.

■ SEPTA also relies on a new state law enacted in August 1991. This law provides for the revenues from a variety of fees and taxes to be paid into a "Public Transportation Assistance Fund" and distributed among "transit entit[ies]" in accordance with a statutory formula. Act 26, § 1314. The law also provides for the Commonwealth to make an annual appropriation for public transportation assistance in order to meet certain needs. *See* Act 26, §§ 1302(2)(iii) and (3), 1303(a).[12] Without knowing the percentage of SEPTA's revenues that will come from state funds under this new law, and without

---

11. SEPTA received $147,360,000 in state subsidies out of operating funds of $554,852,000.

12. Section 1302(2)(iii) of the Act provides for the Department of Transportation

[t]o make grants to municipalities, counties, or their instrumentalities, and to agencies and instrumentalities of the Commonwealth to supplement federal or local or federal and local funds for use ...

(iii) To assist in providing grants to continue necessary service to the public, to permit needed improvements in services which are not self-supporting, to permit services which may be socially desirable but economically

unjustified, and otherwise for any purpose in furtherance of urban common carrier mass transportation....

Section 1302(3) of the Act provides for the Department

to make grants to any transportation company or companies for use in providing necessary service to the public, to permit needed improvements in services which are not self-supporting, to permit services which may be socially desirable but economically unjustified, and otherwise for any purpose in furtherance of urban common carrier mass transportation.

knowing how the provisions relating to annual appropriations will be interpreted and implemented, we believe that the future impact of this new law is too uncertain to be given significant weight in our present decision.

We therefore conclude that the funding factor weighs at least as strongly against SEPTA's Eleventh Amendment argument as it did against New Jersey Transit's argument in *Fitchik*.

2. *Status under state law.* In *Fitchik*, 873 F.2d at 662–63, we found that this factor weighed "slightly" in favor of NJT's Eleventh Amendment argument, and SEPTA's status under state law is not markedly different from that of New Jersey Transit. Both entities possess certain attributes not characteristic of an arm of a state: both have a separate corporate existence,[13] the power to sue and be sued,[14] and the power to enter into contracts and make purchases on their own behalf.[15] Both entities also possess attributes associated with sovereignty, including exemption from state property taxation [16] and certain public powers such as the power of eminent domain.[17] In addition, both entities are treated like their respective states under state tort laws: NJT, like the State of New Jersey itself, is subject to the New Jersey Tort Claims Act,[18] and SEPTA, like the Commonwealth of Pennsylvania, is subject to the Pennsylvania Sovereign Immunity statute.[19]

SEPTA differs from NJT in that SEPTA is proclaimed by statute to be "an agency and instrumentality" of the Commonwealth, but this same provision also describes SEPTA as a "separate body corporate and public." [20] On the whole, SEPTA's status under state law is not substantially stronger than NJT's, and this factor consequently weighs "slightly" in favor of Eleventh Amendment protection.

3. *Autonomy.* In *Fitchik*, 873 F.2d at 664, we found that this factor weighed "slightly in favor of according NJT immunity" because "the degree of control by the governor [was] fairly substantial." We noted (*id.* at 663) that NJT possessed a measure of autonomy, since it was governed by its own board of directors with "significant powers," including the exclusive power to initiate action and the power "to enter contracts, bring lawsuits, purchase and sell property, buy insurance, structure the corporation's internal management, and set and collect fares." On the other hand, we observed that "three of the seven board members must be members of the executive branch, and the governor may veto the board's actions" (*id.* at 663).

SEPTA enjoys more autonomy. SEPTA's board possesses all of the powers cited in *Fitchik*, but its actions are not subject to gubernatorial veto. Moreover, only five of the fifteen board members are appointed by state officials; all of the rest are appointed by the counties that SEPTA serves.[21] Although this indicates influence on SEPTA by the counties, it is the influence of the state, not that of the counties, that is important for Eleventh Amendment purposes. Thus, the autonomy factor, which weighed "slightly" in NJT's favor, is appreciably weaker here.

---

**13.** *Fitchik*, 873 F.2d at 663 (NJT). Pa.Stat.Ann. tit. 55, § 600.303(a) (Purdon 1991 Supp.); 26 Act § 1502 (SEPTA).

**14.** *Fitchik*, 873 F.2d at 663 (NJT). Pa.Stat.Ann. tit. 55, § 600.303(d)(2) (Purdon 1991 Supp.); 26 Act § 1503(2) (SEPTA).

**15.** *Fitchik*, 873 F.2d at 663 (NJT). Pa.Stat.Ann. tit. 55, § 600.303(d)(5), (11), (12), (13), (14); 26 Act §§ 1503(5), (11), (12), (13), (14) (SEPTA).

**16.** *Fitchik*, 873 F.2d at 663 (NJT). Pa.Stat.Ann. tit. 55, § 600.342 (Purdon 1991 Supp.); 26 Act § 1542 (SEPTA).

**17.** *Fitchik*, 873 F.2d at 663 (NJT). Pa.Stat.Ann. tit. 55, § 600.303(d)(15) (Purdon 1991 Supp.); 26 Act §§ 1503(15), 1506 (SEPTA).

**18.** *Fitchik*, 873 F.2d at 662–63.

**19.** *See Feingold v. Southeastern Pa. Transp. Auth.*, 512 Pa. 567, 517 A.2d 1270, 1274–76 (1986); *Hall v. Southeastern Pa. Transp. Auth.*, 596 A.2d 1153 (Pa.Commw.Ct.1991).

**20.** Pa.Stat.Ann. tit. 55, § 600.303(a) (Purdon 1991 Supp.); 26 Act § 1502.

**21.** Pa.Stat.Ann. tit. 55, § 600.317(a) (Purdon 1991 Supp.); 26 Act § 1517.

■ 4. *The totality of factors.* Funding, the most important factor, weighs at least as strongly against SEPTA as it did against NJT. SEPTA's status under state law is not substantially stronger than NJT's, and SEPTA has significantly more autonomy. On balance, SEPTA's Eleventh Amendment argument is weaker than NJT's. Since we are not prepared to overrule *Fitchik*, it follows that SEPTA is not protected by the Eleventh Amendment.

■ G. In light of our conclusion that SEPTA lacks Eleventh Amendment protection, SEPTA's argument that it is not a "person" under Section 1983 requires only brief discussion. As previously noted, *see* page 812, *supra*, SEPTA never raised this argument until questioned during oral argument before the panel, and we generally do not raise new issues on our own motion unless federal jurisdiction is implicated. While the question of SEPTA's status under the Eleventh Amendment is sufficiently jurisdictional in nature to permit a court to raise the question on its own motion, the argument that SEPTA is not a "person" under Section 1983, when stripped of its Eleventh Amendment component, does not implicate federal jurisdiction unless the claim that SEPTA is a "person" was made in bad faith or was "wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–09 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

Under this test, the claim that SEPTA is a "person" did not raise any jurisdictional issue. Indeed, SEPTA's only grounds for contending that it is not a "person" are the arguments based on the Eleventh Amendment and *Will* that were discussed above. SEPTA does not maintain that its position finds any support in the language or legislative history of Section 1983 or in cases (other than *Will*) that construe that provision. Thus, it is apparent that SEPTA is a "person" under Section 1983, as our prior

decisions and SEPTA itself appear to have assumed for some time. *See, e.g., Davis v. Southeastern Pa. Transp. Auth.*, 924 F.2d 51 (3d Cir.1991) (appeal from an award of attorneys fees in a successful Section 1983 claim against SEPTA). We will therefore turn to the arguments made by the parties in their initial briefs.

### III.

SEPTA contends that Bolden's drug test was reasonable because his job posed a "substantial risk of harm to himself and others." Brief for Appellee/Cross–Appellant at 22. This argument must be analyzed within the framework provided by prior drug testing cases decided by the Supreme Court and by this court.

A. In *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *Treasury Employees v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the Supreme Court discussed the circumstances in which government [22] may require warrantless drug testing of employees without probable cause or reasonable suspicion of drug use. The Court wrote that "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Treasury Employees*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91. Applying this standard, the Court in *Skinner* upheld Federal Railroad Administration regulations requiring blood and urine tests of railroad employees who are involved in certain train accidents, as well as regulations permitting railroads to administer breath and urine tests to employees who violate certain safety rules. In analyzing the privacy interests of the affected employees, the Court noted (489 U.S. at 627, 109 S.Ct. at 1418) that these employees' expectations of privacy

---

**22.** SEPTA has not contested that its acts are "state action" under the Fourteenth Amendment. That SEPTA may not raise the Eleventh Amendment defense does not affect its status under the Fourteenth Amendment. *See supra* p. 813.

were "diminished by reason of their participation in an industry that is regulated pervasively to ensure safety." Turning to the other side of the scale, the Court observed that the government interest in testing was "compelling" because "[e]mployees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences. Much like persons who have routine access to dangerous nuclear power facilities, ... employees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.* 489 U.S. at 628, 109 S.Ct. at 1419.

In *Treasury Employees v. Von Raab, supra,* the Court upheld a Customs Service program requiring urinalysis of employees seeking transfer or promotion to positions that are directly involved in drug interdiction or that require the carrying of firearms. The Court found that employees in these positions had a diminished expectation of privacy and that the government had a "compelling interest" in conducting the tests. The Court wrote (*id.* 489 U.S. at 670, 109 S.Ct. at 1393) that the "national interest" in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics. The Court observed (*id.*) that drug-using agents with interdiction responsibilities could "facilitate the importation of sizeable drug shipments or block apprehension of dangerous criminals." With respect to employees who carry weapons, the Court stated (*id.* 489 U.S. at 671, 109 S.Ct. at 1393) that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."

We have also previously upheld warrantless and suspicionless testing of employees holding positions analogous to those in the Supreme Court cases. As previously noted (*see* page 810 and footnote 4, *supra*), in *Transport Workers' Union, Local 234 v. SEPTA, supra,* we upheld SEPTA's program of random testing for employees in safety-sensitive positions. In our opinion after remand by the Supreme Court, we stressed that we reached this holding "only in light of the special circumstances and extraordinarily compelling government interest involved in testing railway operating personnel who 'can cause great human loss before any signs of impairment become noticeable to supervisors or others.' " 884 F.2d at 712, *quoting Skinner,* 489 U.S. at 628, 109 S.Ct. at 1419.

Previously, in *Policemen's Benevolent Ass'n, Local 318 v. Washington Township,* 850 F.2d 133, 135 (3d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), we upheld a municipality's random drug testing program for police officers. We noted (850 F.2d at 141) that "the police industry [was] probably the most highly regulated" of any in the state, and that the police officers were "members of quasi-military organizations, called upon for duty at all times, armed at almost all times, and exercising the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use force to arrest and detain them." *See also Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986) (upholding random testing of employees in the heavy-regulated horse racing industry).

■■■ B. In the present case, we must determine whether the drug test administered to Bolden may be justified within the framework of these precedents. Accordingly, we must balance Bolden's legitimate privacy expectations against the special need for testing asserted by SEPTA. Unlike a determination of "reasonableness" in ordinary tort cases and some other contexts, this balancing process presents a question of law, and therefore we exercise plenary review of the district court's determination.[23]

---

23. Without objection from the parties, the district court in this case instructed the jury to balance Bolden's privacy interests against SEP-

TA's asserted need for testing and to determine whether the test was reasonable under the circumstances. 3/15/1990 Tr. at 8–12. This ap-

██ It is clear that compulsory, suspicionless drug testing of a person holding Bolden's job falls outside the precedents discussed above. In all of those cases, the employees subjected to suspicionless testing were found to have diminished privacy expectations due to pervasive governmental regulation of the jobs they performed. Here, SEPTA has not shown that maintenance custodians are pervasively regulated or that they have diminished privacy expectations for any other reason.

On the other side of the scale, SEPTA's brief asserts in passing that Bolden's duties posed a substantial risk of harm to others, but we find no factual support in the record for this contention. SEPTA did not include maintenance custodians among the employees in "safety sensitive" positions who are covered by its random-testing program. *See* 863 F.2d at 1114 & n. 2. Moreover, the nature of a maintenance custodian's work does not appear to involve any great risk of causing harm to other persons. SEPTA's job description for a maintenance custodian lists the position's routine duties and responsibilities as follows:

### GENERAL

To be proficient in the cleaning maintenance of SEPTA locations, facilities and equipment and in the performance of related duties under the general supervision of the foreperson.

1. Assigned to travel throughout SEPTA system to clean subway-elevated and surface locations, facilities and equipment.

2. Scrapes and cleans floors, walls, walks, and all SEPTA facilities.

3. Paints various items as required, such as shop equipment, wheel rims, etc.

4. Sweeps, cleans, washes vehicle interiors, exteriors.

5. Polices premises for debris, trash and scrap. Loads into truck for removal.

The main thrust of SEPTA's argument is not that Bolden's duties posed a risk to others but that Bolden himself might be injured at the Fern Rock Depot if his faculties were impaired by drug use. Neither the Supreme Court nor this court has endorsed the proposition that compulsory, suspicionless drug testing may be conducted to prevent an employee from causing harm to himself, rather than to others. Acceptance of SEPTA's argument would dramatically extend current law.

In any event, we need not and do not hold that drug testing may never be justified on this ground. For present purposes, it is enough to note that SEPTA has not shown that Bolden's position involved any unusual degree of personal danger. Certainly the routine duties and responsibilities noted above do not suggest that his job was unusually dangerous. SEPTA does not cite any statistics regarding injuries at the Fern Rock Depot or injuries to maintenance custodians, but merely states that "accidents have occurred" at the depot and specifically mentions a single accident several years ago. SEPTA also points to several hazards at the depot, such as open pits, the partially-exposed "third rail" that supplies electricity to subway cars, and trains that enter and depart at speeds of up to eighteen miles per hour. These facts do not portray a site that is markedly more dangerous than countless other industrial or transportation facilities. Thus, we hold

proach was incorrect. The task of balancing the competing interests in this context must be performed by the courts, not by juries. Determination of reasonableness under the Fourth Amendment is a question of law. *United States v. Evans,* 937 F.2d 1534, 1536 (10th Cir.1991); *United States v. Morgan,* 936 F.2d 1561, 1565–66 (10th Cir.1991); *United States v. Butler,* 904 F.2d 1482, 1484 (10th Cir.1990). *See also Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (court determines reasonableness of search); *United States v. Salmon,* 944 F.2d 1106 (1991) (same). The reasonableness of a search or seizure must be determined based on constitutional law, not a factual, reasonable-person determination. If the Fourth Amendment balancing process were submitted to juries, conflicting decisions regarding the constitutionality of identical drug testing provisions would almost certainly result.

While the submission of this question to the jury was erroneous, reversal on this ground is not required. SEPTA did not object to the court's instruction. Moreover, it is clear that the jury's finding—that compulsory drug testing of Bolden was unconstitutional—was correct.

that SEPTA had no special need to subject Bolden to a drug test based on any dangers presented by his job.

## IV.

■ SEPTA also maintains that Bolden consented to the drug test because he knowingly submitted to the test without voicing any objection and later testified that he had "no qualms" about taking the test. A search of a person is constitutional if the person freely and voluntarily consents. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 224, 93 S.Ct. 2041, 2044, 2046, 36 L.Ed.2d 854 (1973). If the party conducting the search claimed the authority to search without consent, that factor weighs against a finding of voluntary consent. *See, e.g., Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979); *Bumper v. North Carolina,* 391 U.S. 543, 549–50, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *United States v. Molt,* 589 F.2d 1247, 1251 (3d Cir.1978). Consent to search is a question of fact to be determined from the totality of the circumstances. *Id.* 412 U.S. at 226, 93 S.Ct. at 2047. Therefore, in reviewing a finding of fact on consent, we must view the facts in the light most favorable to the finding. *See Edwards v. City of Philadelphia,* 860 F.2d 568, 571 n. 2 (3d Cir.1988); *Black v. Stephens,* 662 F.2d 181, 188 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982).

■ In this case, it is not clear that SEPTA preserved the issue of consent at trial. Testimony and argument on the issue were presented, and both Bolden and SEPTA submitted proposed jury instructions on consent. However, SEPTA later submitted an amended instruction that neglected to mention consent, the court gave no instruction on consent, and the record contains no indication that SEPTA objected to this omission. Apparently the jury was left to consider the facts bearing on consent as part of its general determination regarding the reasonableness of the test.

In any event, even if the issue were preserved,[24] the evidence, when viewed in the light most favorable to the verdict winner, was sufficient to support a finding that Bolden did not consent. In a portion of SEPTA's answer to Bolden's complaint that was read into evidence, SEPTA stated that it "required the Plaintiff to submit to a body fluids test for intoxicants and controlled substances." SEPTA's medical director testified that if Bolden had not undergone the test, he could not have been reinstated. SEPTA does not claim that Bolden verbally consented to the test. Instead, SEPTA relies on Bolden's knowledge that the test would be performed, his submission to the test without voicing objection, and his subsequent testimony that he had "no qualms" about the test. In essence, SEPTA argues that Bolden's silent submission to an otherwise unconstitutional search on pain of dismissal from employment constituted consent as a matter of law. We reject this argument.

Acceptance of SEPTA's argument in cases involving law enforcement searches would mean that no person ordered by the police to submit to a search could claim that the search was unconstitutional unless the person refused to submit or at least voiced an objection. Caselaw does not support this position. Far from holding that silent submission to a law enforcement search constitutes voluntary consent as a matter of law, the Supreme Court has examined the totality of the circumstances even in cases in which the defendant expressed verbal consent. In *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879–80, 64 L.Ed.2d 497 (1980), the defendant "was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it." 446 U.S. at 558, 100 S.Ct. at 1879. Holding that the totality of the evidence was sufficient to support the district court's finding of voluntary consent, the Court observed that "[a]lthough the Constitution does not require 'proof of

---

**24.** Judge Mansmann would hold that SEPTA has not preserved the issue of Bolden's consent as a defense to its liability and cannot raise the issue on appeal. Thus she would not reach the merits of the consent dispute.

knowledge of a right to refuse as the *sine qua non* of an effective consent to a search, ... such knowledge was highly relevant to the determination that there had been consent.'" *Id.* at 558–59, 100 S.Ct. at 1879–80, *quoting Schneckloth,* 412 U.S. at 234, 93 S.Ct. at 2051. In *Schneckloth,* the police stopped a car and asked an occupant whether they could search the car. The occupant said, "Sure, go ahead." 412 U.S. at 220, 93 S.Ct. at 2044. The Supreme Court held that the totality of the circumstances were sufficient to show voluntary consent. Since *Mendenhall* and *Schneckloth* both involved defendants who expressly consented, those cases would have been very easy indeed if voluntary consent could be found as a matter of law based on silent submission to a search performed by an officer claiming the right to search without consent. The analysis undertaken in those cases plainly shows that silent submission to a law enforcement search is not enough to establish voluntary consent as a matter of law.

To be sure, cases involving consent to search by law enforcement officers should not be applied mechanically to cases like this one involving administrative searches. Consent must be determined based on the totality of the circumstances in each individual case, and circumstances relating to a law enforcement search may differ from those relating to an administrative search. To take one example, the degree of coercive authority projected by those conducting the search (*see Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879), may be different.

Nevertheless, we are convinced that the totality of the circumstances in this case was sufficient to support a finding that Bolden did not voluntarily consent. Viewed in the light most favorable to the verdict, the evidence showed that Bolden submitted to drug testing without voicing any objection, not because he was truly willing to undergo the test, but because he understood that the test was compulsory and that the alternative to submission was loss of his job—perhaps permanently or until after another round of potentially lengthy grievance proceedings or litigation. Accordingly, we cannot hold that Bolden consented as a matter of law.

## V.

We find greater merit in SEPTA's reliance on the settlement it reached with Local 234 following Bolden's discharge for drug use. As previously noted, the union filed a grievance on Bolden's behalf pursuant to the applicable provisions of the collective bargaining agreement. SEPTA and the union eventually reached a settlement of the grievance under which Bolden was to be reinstated with back pay for the second half of the discharge period but was required to submit to a drug test before returning to work, as well as to unannounced follow-up testing for some time thereafter.[25] Bolden did not personally endorse this settlement. In considering the effects of the grievance settlement, it is important to distinguish between two separate questions: (a) the res judicata or collateral estoppel effect of an arbitration award or grievance settlement with respect to a subsequent claim under 42 U.S.C. § 1983 and (b) the effect for Fourth Amendment purposes of a union's consent to drug testing, either during the negotiation of a new collective bargaining agreement or in resolving disputes about the meaning or application of an existing agreement. We will discuss each of these questions in turn.

A. We agree with Bolden that the grievance settlement in this case did not preclude his Section 1983 claim under the doctrines of res judicata or collateral estoppel. The Supreme Court considered closely related questions in several cases and held that prior arbitration decisions did not preclude subsequent federal statutory claims.

In *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court held that an adverse arbitration decision did not bar a discharged employee from suing under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

**25.** *See* page 811, *supra.*

*et seq.* In *Barrentine v. Arkansas–Best Freight Sys.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), the Court reached the same result concerning a claim under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Finally, in *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)—a suit, like Bolden's, under 42 U.S.C. § 1983—the Court held that an arbitration decision did not preclude a discharged public employee from suing on the ground that the discharge violated his constitutional rights.[26]

Insofar as the doctrines of res judicata and collateral estoppel are concerned, the present case differs from *McDonald* in only one particular: in *McDonald* there was a prior arbitration decision whereas here there was a prior grievance settlement that Bolden did not personally endorse. For present purposes, however, we see no basis for regarding this distinction as dispositive. Accordingly, we hold that the grievance settlement in this case did not have a res judicata or collateral estoppel effect with respect to Bolden's Section 1983 claim.

B. While *Alexander, Barrentine,* and *McDonald* control any res judicata or collateral estoppel question in this case, they do not resolve the question whether, for Fourth Amendment purposes, a public employee union may consent to future drug testing of the employees it represents. Those cases did not involve the question whether a union could affect employees' statutory rights by consenting to future actions proposed by an employer. In addition, none of those cases concerned Fourth Amendment rights.[27] Thus, *Alexander, Barrentine,* and *McDonald* do not control the Fourth Amendment question presented by the case at hand.

In analyzing this Fourth Amendment question, we begin by noting that there are a variety of circumstances in which a third party may validly consent to a search or seizure. Such consent may be provided by an agent to whom such authority has been conferred. *Stoner v. Cal.,* 376 U.S. 483, 489, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *United States v. House,* 524 F.2d 1035, 1041 (3d Cir.1975). In addition, consent may be provided by certain other third parties with substantial interests or responsibilities related to the search or seizure. These third parties include, among others, a party with common authority over the premises or item to be searched (*Matlock v. United States,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969)) and employees with significant responsibilities relating to the object of the search (*see* 3 W. LaFave, *Search and Seizure* § 8.6(c) (collecting cases)). In accordance with these precedents, we believe that a union such as Bolden's may validly consent to terms and conditions of employment, such as submission to drug testing, that implicate employees' Fourth Amendment rights.

The authority of Bolden's union to make binding contractual commitments regarding terms and conditions of employment is well established. Under the Pennsylvania Public Employee Relations Act (PERA), Pa. Stat. tit. 43 § 1101.606 (Purdon 1991), a union is the exclusive collective bargaining representative for all of the employees in the unit, and therefore the union, in entering into a collective bargaining agreement, may agree to terms and conditions of employment that are contractually binding on all of the employees. *See Vaca v. Sipes,*

---

**26.** In *Gilmer v. Interstate/Johnson Lane Corp.,* — U.S. ——, 111 S.Ct. 1647, 1656–57, 114 L.Ed.2d 26 (1991), the Supreme Court explained that *McDonald* and the prior cases "did not involve the issue of the enforceability of an agreement to arbitrate statutory claims" but rather "the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims." Since the collective bargaining agreement in this case did not require arbitration of Section 1983 claims, this case falls within the *Alexander–Barrentine–McDonald* line of cases.

**27.** Whereas a search or seizure comports with the Fourth Amendment if conducted pursuant to voluntary consent, rights under Title VII and the Fair Labor Standards Act may not be prospectively waived, as the Court pointedly noted in *Alexander,* 415 U.S. at 51–52, 94 S.Ct. at 1021–22, and *Barrentine,* 450 U.S. at 740, 101 S.Ct. at 1444.

386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); *Cohen v. Temple Univ.*, 299 Pa.Super. 124, 445 A.2d 179, 185 (1982).

The Supreme Court has recognized, most notably in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and its progeny, that a union's authority as exclusive bargaining agent necessarily entails some restrictions on constitutional rights that individual employees would otherwise enjoy. As the Court summarized in *Teachers v. Hudson*, 475 U.S. 292, 301–02, 106 S.Ct. 1066, 1073–74, 89 L.Ed.2d 232 (1986) (footnote omitted):

> In *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), we recognized that requiring non-union employees to support their collective-bargaining representative "has an impact upon their First Amendment interests," *id.*, at 222, 97 S.Ct. at 1793, and may well "interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." *Id. See also id.*, at 255, 97 S.Ct. at 1809 (POWELL, J., concurring in judgment). We nevertheless rejected the claim that it was unconstitutional for a public employer to designate a union as the exclusive collective-bargaining representative of its employees, and to require nonunion employees, as a condition of employment, to pay a fair share of the union's cost of negotiating and administering a collective-bargaining agreement.

The Court has permitted such interference with First Amendment interests when necessary or reasonable "for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." *Ellis v. Railway Clerks*, 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). *See also Robinson v. N.J.*, 741 F.2d 598, 607 (3d Cir.1984). On the other hand, the Court has not permitted such interference for other purposes, such as support for political candidates or ideological causes. *Abood*, 431 U.S. at 235, 97 S.Ct. at 1799; *Teachers v. Hudson*, 475 U.S. at 302, 106 S.Ct. at 1073. We see no reason why similar principles should not be employed in determining whether a union, in its capacity as exclusive bargaining representative, may consent to terms and conditions of employment implicating Fourth Amendment interests.

Several courts of appeals in recent years have suggested that unions, in negotiating collective bargaining agreements, may consent to drug testing or analogous searches on behalf of employees. In *Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111, 119 (1st Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989), the court observed, in discussing an employee's rights under the Fourth Amendment and state privacy law, that "the dimensions of [the employee's] cognizable expectation of privacy [regarding drug testing] depend to a great extent upon concessions the union made regarding working conditions during collective bargaining." In *Utility Workers of Am. v. Southern Cal. Edison*, 852 F.2d 1083, 1086 (9th Cir.1988) (footnote omitted), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1530, 103 L.Ed.2d 835 (1989), the court wrote:

> To the best of our knowledge, ... no court has held that the right to be free from drug testing is one that cannot be negotiated away, and we decline to make such a ruling here.

*See also Stikes v. Chevron, USA, Inc.*, 914 F.2d 1265, 1270 (9th Cir.1990). Similarly, in *American Postal Workers Union v. USPS*, 871 F.2d 556, 567 (6th Cir.1989), the court rejected a Fourth Amendment challenge to searches of employee lockers, in part because the searches were authorized by the collective bargaining agreement.

In recent years, many employers in the private and public sectors have sought to implement drug testing programs. The National Labor Relations Board has held that drug testing is a mandatory subject of bargaining. *See Johnson–Bateman Co. and Machinists, AFL–CIO, Dist. Lodge 120*, 131 LRRM (BNA) 1393, 1396–98 (1989). *See also* General Counsel Memorandum 87–5 (September 8, 1987), Guideline Memorandum Concerning Drug or Alcohol

Testing of Employees (recommending that the NLRB take the position that drug and alcohol testing be a mandatory subject of bargaining). *Cf. Consolidated Rail Corp. v. Railway Labor Executives Ass'n*, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (Railway Labor Act). Through collective bargaining, a public employer and union can reach agreement on detailed factual questions (such as whether particular jobs are safety-sensitive) that may have important implications under the Fourth Amendment.[28] If individual public employees may litigate such questions despite the resolution reached through collective bargaining, the utility of collective bargaining with respect to drug testing in the public sector would be greatly diminished. In sum, we conclude that a public employee union acting as exclusive bargaining agent may consent to drug testing on behalf of the employees it represents.

Such consent may be manifested in several different contexts. The simplest example occurs when a union expressly agrees to drug testing during the negotiation of a collective bargaining agreement. As previously explained, individual employees are bound by such express consent.

Essentially the same analysis applies when a collective bargaining agreement implicitly authorizes drug testing. In *Consolidated Rail Corp. v. Railway Labor Executives*, 491 U.S. 299, 311–12, 109 S.Ct. 2477, 2484–85, 105 L.Ed.2d 250 (1989) (citations omitted), the Supreme Court explained that a collective bargaining agreement lacking any provision expressly authorizing drug tests may nevertheless implicitly permit such tests based on " 'practice, usage and custom.' " When a collective bargaining agreement contains such implied authorization, that authorization must bind individual employees as surely as an express term.

■ Whether a particular collective bargaining agreement contains such implied authorization must be determined in accordance with the established procedures for interpreting collective bargaining agreements. If the agreement contains provisions specifying mandatory grievance and arbitration proceedings, those procedures must be followed and exhausted before an employee may sue under the agreement. *DelCostello v. Teamsters*, 462 U.S. 151, 163, 103 S.Ct. 2281, 2289–90, 76 L.Ed.2d 476 (1983). The result of this process may be a settlement or arbitration decision that the collective bargaining agreement implicitly or explicitly permits drug testing of some or all employees. The courts must defer to this interpretation of the agreement unless the employee can show that the union has breached its duty of fair representation in agreeing to the drug testing. *Chauffers, Teamsters and Helpers, Local No. 391*, 494 U.S. 558, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990) (NLRA); *Fouts v. Allegheny County*, 64 Pa.Cmwlth. 441, 440 A.2d 698, 701 (1982) (PERA). In other words, if the union agrees, or if binding arbitration establishes, that the collective bargaining agreement impliedly authorizes drug testing, individual employees are bound by this interpretation unless they can show a breach of the duty of fair representation.

Here, Bolden's union, acting as his exclusive bargaining agent,[29] pressed a griev-

---

**28.** Although the collective bargaining agreement in effect at the time of Bolden's test did not contain express drug testing provisions, the 1989–92 collective bargaining agreement contains such provisions. Exhibit to Defendant SEPTA's Motion for Summary Judgment Against the Plaintiffs.

**29.** Even if Bolden's union had lacked actual authority to consent to future drug testing on his behalf, SEPTA would not have violated the Fourth Amendment by conditioning Bolden's continued employment on submission to future drug testing. A search is constitutional if it is based on reasonable belief that a third party had authority to consent. *Ill. v. Rodriguez*, —— U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Here, SEPTA had reasonable grounds to believe that the union possessed the authority to consent to future drug testing of Bolden. As noted, the union was Bolden's exclusive collective bargaining representative, and the union had represented Bolden regarding the first grievance a short time earlier and had secured his reinstatement. During the same period, the union also represented dozens of other SEPTA employees in grievances based on drug testing. Under these circumstances, SEPTA's reliance on the union's authority to settle Bolden's grievance and to consent to future drug testing was reasonable. Therefore, SEPTA's insistence

ance on his behalf and eventually entered into a voluntary settlement under which Bolden was to be reinstated with partial back pay on condition that he submit to future drug testing. In effect, the union and SEPTA agreed at that time that the collective bargaining agreement permitted future drug testing of Bolden in accordance with the settlement terms. Thus, unless the union breached its duty of fair representation, this settlement had the same effect under labor law and under the Fourth Amendment as if Bolden himself had consented to such future drug testing.

 Bolden, however, has neither claimed nor shown that the union breached its duty of fair representation in its handling of his second grievance. As noted earlier, the claim asserted against the union in Bolden's amended complaint was not for breach of the duty of fair representation but for conspiring with SEPTA to violate his constitutional rights. The jury rejected this claim, and Bolden has not contested that verdict on appeal. Consequently, we conclude that Bolden was bound by the terms of the settlement and that Bolden's rejection of reemployment on these terms cut off his right to damages for lost wages following that date. *See, e.g., Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982); *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 770 (3d Cir.1989); *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1004–05 (3d Cir.1988). Because it is impossible to determine how much of the jury verdict was based on lost wages and emotional distress occurring after this settlement, we must reverse the award of damages and remand for a new trial on this issue.

## VI.

A. The final question that we must consider is whether the district court properly dismissed Bolden's request for punitive damages.[30] Like the district court, we begin our analysis with *City of Newport v.*

*Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), in which the Supreme Court held that municipalities are immune from punitive damages under Section 1983. In reaching this conclusion, the Court considered both the history and policy of Section 1983.

In analyzing history, the Court began by assuming, as it has in other cases, that Section 1983 should not be construed as abrogating established common law immunities unless the legislative history showed that Congress desired such a result. The Court had previously held that this assumption did not lead to the conclusion that municipalities were entirely exempt from Section 1983 claims, since by 1871 municipalities no longer enjoyed complete immunity from suit under state law. *Owen v. City of Independence*, 445 U.S. 622, 646–47, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980). *See also Will*, 491 U.S. at 67 n. 7, 109 S.Ct. at 2310 n. 7. In *City of Newport*, however, the Court found that while municipalities could be sued under state law when Section 1983's predecessor was enacted, the precedents at that time "were virtually unanimous in denying [punitive] damages against a municipal corporation." The Court therefore assumed that " 'Congress would have specifically so provided had it wished to abolish [this] doctrine.' " *Id.* 453 U.S. at 263, 101 S.Ct. at 2758 quoting *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). The Court, however, found nothing in the legislative history of Section 1 of the 1871 Act to suggest that Congress wanted to disturb the immunity from punitive damages that municipalities had previously enjoyed. 453 U.S. at 263–66, 101 S.Ct. at 2757–59.

The Court then examined "whether considerations of public policy dictate[d] a contrary result." *Id.* at 266, 101 S.Ct. at 2759. Noting that a major purpose of punitive damages is to punish wrongdoers, the Court concluded that assessing punitive

---

upon compliance with the settlement as a condition of employment did not violate Bolden's Fourth Amendment rights.

**30.** This is a question of law over which we exercise plenary review.

damages against a municipality would not serve this purpose because those damages would not be paid by the officials responsible for the wrongdoing but would be "visited upon the shoulders of blameless or unknowing taxpayers." *Id.* at 267, 101 S.Ct. at 2760. The Court also questioned whether punitive damages were necessary to deter future violations. *Id.* at 268–69, 101 S.Ct. at 2760–61. The Court observed that other means of deterring constitutional violations by municipal officials were already available, such as punitive damage awards against the offending officials themselves and the discharge or electoral defeat of officials whose violations result in compensatory damage awards that must be paid with municipal funds. *Id.* at 268–70, 101 S.Ct. at 2760–61. Finally, the Court noted that juries traditionally have had broad discretion in assessing the amount of punitive damages and that evidence of a municipality's large revenues might encourage sizeable awards. *Id.* at 270, 101 S.Ct. at 2761. The Court wrote (*id.* at 270–71, 101 S.Ct. at 2761–62) that "[t]he impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial, and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large."

■ B. Based on the Supreme Court's reasoning in *City of Newport,* we conclude that SEPTA, like a municipality, is immune from punitive damages under Section 1983. In view of the many characteristics that SEPTA shares with federal, state, and local agencies, both history and policy considerations support this conclusion.

History cannot provide the same sort of specific guidance in this case as it did in *City of Newport* because SEPTA, unlike municipalities, is a distinctively twentieth century creation. It is doubtful that any closely comparable entities existed in 1871. Thus we cannot examine court decisions

from that era addressing the immunities of such entities.

History does reveal, however, that during that era all governmental units, whether performing governmental or proprietary functions, were generally immune from punitive damages. As noted in *City of Newport,* municipalities and counties enjoyed such immunity, even when performing "proprietary" functions. *See Genty v. Resolution Trust Corp.,* 937 F.2d 899, 910 (1991). In addition, both states (*see Will v. Michigan Dep't of State Police,* 491 U.S. at 67, 109 S.Ct. at 2309) and the federal government (*see Feres v. United States,* 340 U.S. 135, 139–40, 71 S.Ct. 153, 156, 95 L.Ed. 152 (1950)), enjoyed complete sovereign immunity from suit without their consent.

SEPTA, of course, is not a governmental unit in the traditional sense, but it shares many characteristics with federal, state, and local government agencies. SEPTA is perhaps best described as a hybrid entity with substantial connections to government at all levels—federal, state, and local. While SEPTA's ties to state government are not close enough or exclusive enough to persuade us that SEPTA should be regarded as an alter ego of the Commonwealth for Eleventh Amendment purposes, SEPTA's ties to all levels of government taken together are sufficient to convince us that SEPTA may be analogized to a government entity for purposes of determining whether SEPTA should be liable for punitive damages. Thus, the immunity from punitive damages enjoyed by all levels of government in 1871 weighs in SEPTA's favor here.[31]

Moreover, here as in *City of Newport* (453 U.S. at 266, 101 S.Ct. at 2759), "considerations of public policy" do not "dictate a contrary result." The thrust of the Court's discussion in *City of Newport* was that punitive damage awards against municipal-

---

**31.** The Pennsylvania Supreme Court's decision in *Feingold v. SEPTA,* 517 A.2d 1270 (1986), although not dispositive on the question of federal law now before us, is instructive because of its recognition of SEPTA's governmental character. Noting that "government agencies" have long been exempt from the imposition of puni-

tive damages under Pennsylvania law (*id.* at 1276), the court held that SEPTA's governmental character entitled it to the same immunity. *See also Toombs v. Manning,* 835 F.2d 453, 460–65 (3d Cir.1987) (in banc) (holding that SEPTA is a "Commonwealth party" under Pennsylvania's sovereign immunity statute).

ities would not serve the goals of punishment or deterrence in the same way as punitive damage awards against individuals found to have violated Section 1983. This reasoning is fully applicable to SEPTA. Awarding punitive damages against SEPTA might result in increased taxes or fares and thus punish taxpayers and users of mass transportation who cannot be regarded, except perhaps in an indirect and abstract sense, as bearing any guilt for constitutional violations that SEPTA may commit. *See Feingold,* 517 A.2d at 1277 (punitive damages against SEPTA would be assessed "effectively against taxpayers and the public at large."). *See also Toombs v. Manning,* 835 F.2d 453 at 463. Similarly, the deterrent effect that such awards may have on SEPTA decision makers is far more speculative than the deterrent effect of punitive damage awards on individuals who violate Section 1983, and other means of deterring violations by SEPTA officials—including the assessment of damages against offending the officials themselves and adverse employment actions against such officials—are already available. Finally, SEPTA would be a tempting target for large punitive damage awards by juries unduly influenced by SEPTA's size and revenues, which greatly exceed those of many municipalities.

In sum, we believe that the Supreme Court's reasoning in *City of Newport* is applicable to SEPTA, and we consequently conclude that SEPTA, like a municipality, is immune from punitive damages under Section 1983.

### VII.

In conclusion, we hold that SEPTA is not protected by the Eleventh Amendment, that the drug test administered to Bolden was unconstitutional, that SEPTA is not liable for wages lost by Bolden after the settlement between SEPTA and his union, and that punitive damages cannot be assessed against SEPTA under Section 1983. We will therefore affirm the judgment of the district court insofar as it holds that SEPTA is liable for violating Bolden's constitutional rights, but we will vacate the awards of damages and remand for further proceedings related to this issue.

GREENBERG, Circuit Judge, dissenting:

I respectfully dissent as I believe that this action is barred against SEPTA by the Eleventh Amendment. Initially, of course, I express my agreement with the majority that "it is appropriate to reach the Eleventh Amendment issue in this case." Typescript at 10. But unlike the majority I believe that the Eleventh Amendment bars this action for two reasons. In my view, the dissent by Judge Rosenn in *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 664 (3d Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 S.Ct. 107 (1989), in which four judges joined, was correct and the agency in that case, New Jersey Transit Rail Operations, Inc., was entitled to Eleventh Amendment immunity. I joined in that dissent and adhere to it. While I could not do this as a member of a panel because our internal operating procedures render *Fitchik* binding on subsequent panels, inasmuch as we sit in banc in this case I may reassert the dissenting position, for as an in banc court we are not bound by *Fitchik.*

In the majority opinion, Judge Alito compares New Jersey Transit with SEPTA, typescript 25 to 31, and concludes that its Eleventh Amendment argument is weaker than New Jersey Transit's. Thus, since *Fitchik* is not to be overruled, he logically concludes that SEPTA is not protected by the Eleventh Amendment. In my view, limited to the factors that he set forth, SEPTA's position is not sufficiently distinct from New Jersey Transit's for Eleventh Amendment purposes, so that a different result should be reached here than in *Fitchik.* It thus follows that as I adhere to the dissent in *Fitchik,* I must dissent here.

In fact, however, I think that SEPTA's position is stronger than New Jersey Transit's. I acknowledge that determinations under the Eleventh Amendment are ultimately made under federal and not state law and that an agency can thus enjoy state sovereign immunity protection and yet not enjoy Eleventh Amendment immu-

nity. But still as the majority acknowledges, typescript at 28, status under state law is significant for sovereign immunity purposes. I think that a fuller explication of SEPTA's status under Pennsylvania law than the majority makes leads to a conclusion that it enjoys Eleventh Amendment immunity. While the majority cites 55 Pa. Stat.Ann. § 600.303(a) (1991 Supp.) for the point that SEPTA is "an agency and instrumentality" of the Commonwealth, it should also be pointed out that the same section indicates that it "shall exercise the public powers of the Commonwealth." Furthermore, the Supreme Court of Pennsylvania has "no hesitation in concluding that SEPTA was intended to be considered an agency of the Commonwealth." *Feingold v. Southeastern Pa. Transp. Authority,* 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986); *see also Marshall v. Port Authority,* 524 Pa. 1, 568 A.2d 931 (1990). Finally, our own opinions, though not conclusive on the issue, also point to Eleventh Amendment immunity in this case. *See In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 864 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991); *Toombs v. Manning,* 835 F.2d 453 (3d Cir.1987). Thus, it seems clear to me that SEPTA's position is stronger than New Jersey Transit's, for in *Fitchik* we concluded that the agency's "status under New Jersey statutes [was] ambiguous." *Fitchik,* 873 F.2d at 663. SEPTA's status under Pennsylvania law is not. In the circumstances, I would remand for entry of judgment for SEPTA.[1] Judge Hutchinson joins in this dissenting opinion.

NYGAARD, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion except for Part V and its conclusion. I agree with the majority that Bolden's silent submission to the drug test did not constitute voluntary consent, yet I cannot join its opinion that

Bolden's rights were nonetheless waived by the Transportation Workers' Union Local 234 (TWU) with the grievance settlement. As a matter of law, a union cannot waive the Fourth Amendment rights of its members in a grievance settlement. It occurs to me that this *individual* right is enshrined in our Constitution just so the SEPTAs and TWUs. cannot *collectively* compromise them.

I disagree with the majority's holding that a union has "actual authority" to waive its members' Fourth Amendment rights bound only by the fair representation doctrine. It seems that the fair representation doctrine, a creature of labor law [1], is now to become the new standard for constitutional waiver of Fourth Amendment rights in the public employment sector. I cannot accept this notion. This sweeping assertion divests all public sector employees of their Fourth Amendment rights and strains to make legitimate that which clearly is not.

The majority's reasoning seems to be this: (1) the union is the exclusive bargaining representative for its members under Pennsylvania labor law; (2) hence, it can enter into collective bargaining agreements that effectively restrict Fourth Amendment rights that unionized employees would otherwise enjoy because such agreements permit, among other things, work-related searches and seizures; (3) that being so, there is no apparent reason why a union cannot likewise, in the course of negotiating a grievance settlement, waive its member's constitutional right to be free from unreasonable tests for drugs; and (4) a union member who wishes to challenge such a waiver must first show that the union breached its duty of fair representation, else he is "contractually bound" to the rights waiver.

I start with this fundamental premise: Before the grievance settlement was made, Bolden had a *constitutional* right not to be

---

1. Although Judge Rosenn did not sit in the in banc proceedings in this case, his concurrence filed with the panel opinion reflects the views I express here.

1. Under Pennsylvania labor law, "a union is guilty of unfairly representing an employee if its refusal to carry a grievance through to arbitration is due to arbitrariness, discrimination or bad faith." *Fouts v. Allegheny County,* 64 Pa. Commw. 441, 440 A.2d 698 (1982).

tested for drugs.[2] *See Skinner v. Railway Labor Exec. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (collecting and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable). Under the majority's reasoning this right was waived by TWU just as TWU and other unions "commonly restrict rights that the employees would otherwise enjoy under the Fourth Amendment" and set the "[t]erms and conditions of employment embodied in collective bargaining agreements with public employers."

This reasoning confuses the distinction between a reasonable and an unreasonable search or seizure. The distinction is crucial since it determines whether there is a Fourth Amendment right or not. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) ("The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures.") (emphasis in original).

Indeed, the majority thinks terms and conditions of employment embodied in collective bargaining agreements with public employers commonly restrict "rights" that unionized public employees would otherwise enjoy under the Fourth Amendment. The majority apparently believes that because some reasonable directives may be negotiated in collective bargaining agreements, a union may, in the context of a grievance settlement, concede to the employer rights it could not reasonably have demanded.

I disagree. By choosing to belong to a union, Bolden cannot be said to have delegated complete authority to compromise a right that is the very touch-stone of the Bill of Rights and consecrated by generations of constitutional jurisprudence. Although a union can negotiate the terms and conditions of employment referred to by the majority, they are not Fourth Amendment issues. By accepting work conditions, employees can expect certain restrictions on

their movements for safety and efficiency reasons. But these restrictions are not unreasonable "seizures" under the Fourth Amendment. *See INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984) ("when people are at work their freedom to move about has been meaningfully restricted ... by the workers' voluntary obligations to their employers"). *See also Skinner,* 109 S.Ct. at 1418 ("the expectations of privacy by covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety"); *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (public sector employees have Fourth Amendment protection in their possessions and work stations if there is a reasonable expectation of privacy).

No one would contend, for example, that posting security cameras in highly sensitive areas of a work place constitutes an unconstitutional "search" within the meaning of the Fourth Amendment. It follows that the "rights" properly restricted by collective bargaining agreements do not have constitutional dimensions, but rather are in the nature of contractual entitlements. Like any other privately created rights and obligations, customary conditions of employment may be negotiated by a union on behalf of its members without Fourth Amendment barriers.

The majority also contends that unions possess the authority to consent to periodic, invasive medical examinations (for instance, blood tests or urinalysis to detect disease), which are often important for the protection of co-workers, the employer, and the public, as well as the union employees themselves. Majority Opinion 827. I too have no doubt unions may negotiate and, if collectively ratified by its membership, agree to such tests, including drug tests in some circumstances, not because the union has omnipotent authority under labor law, but because such medical incursions into individual liberty are reasonable under the circumstances and hence do not violate the Fourth Amendment. *See Skinner,* 109

---

2. To conclude otherwise would be inconsistent with the court's holding that SEPTA violated Bolden's Fourth Amendment right when it tested him for drugs.

S.Ct. at 1418–19 (post-accident drug testing without individualized suspicion is reasonable because of strong governmental interest ensuring public safety); *Policemen's Benevolent Ass'n v. Township of Wash.*, 850 F.2d 133 (3d Cir.1988) (drug testing of police officers during annual job physical is valid); *Jones v. McKenzie*, 833 F.2d 335, 341 (D.C.Cir.1987) (drug testing of bus drivers and attendants of handicapped school children "conducted as part of a routine, reasonably required, employment-related medical examination"), *vacated sub nom. Jenkins v. Jones*, 490 U.S. 1001, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989), *replaced*, 878 F.2d 1476 (D.C.Cir.1989) (affirming and modifying its earlier decision); *Amalgamated Transit Union Div. 1279 v. Cambria County Transit Auth.*, 691 F.Supp. 898 (W.D.Pa.1988) (upholding drug testing of certain employees during annual physical); *Burka v. New York City Transit Auth.*, 680 F.Supp. 590 (S.D.N.Y.1988) (same); *Wrightsell v. City of Chicago*, 678 F.Supp. 727, 734 (N.D.Ill.1988) (drug testing as part of "routine, employment-related medical examinations" valid). Since a *reasonable* search or seizure does not violate the Fourth Amendment, reasonable drug tests are proper subjects for negotiation in collective bargaining.

Yet, if for example a union consented to drug testing of *all* its members (regardless of individualized suspicion, an employee's job function, nature of the employer's industry, triggering facts or exigent circumstances), such testing, if without consent by individual union members, would not be reasonable, employment-related physical examinations. Indiscriminate drug testing, entailing invasive blood drawing or other bodily intrusions, is not rendered reasonable for Fourth Amendment purposes by a collective bargaining agreement. The Fourth Amendment bars such drug testing absent a valid *individual* consent or waiver. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (requiring consent by the individual); *Illinois v. Rodriguez*, —— U.S. ——, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (recognizing as valid Fourth Amendment waiver consent given by third party, but

only if the government actor is reasonably mistaken that such third party possessed the right waived and was thus authorized to give consent to search).

The Supreme Court has made clear that random, indiscriminate and discretionary drug testing policies administered without regard to job function, nature of industry, triggering facts, exigent circumstances, or other facts that make for "reasonable" testing violate the Fourth Amendment. *See Skinner*, 109 S.Ct. at 1414. Recently we invalidated SEPTA's return-to-work drug testing policy because "SEPTA has not shown that this aspect of its program is initially justified or that testing of all employees returning after an absence for whatever cause has any relationship to the articulated need for the program." *Transport Workers' Local 234 v. SEPTA*, 863 F.2d 1110, 1122 (3d Cir.1988), *vacated*, 492 U.S. 902, 109 S.Ct. 3208, 3209, 106 L.Ed.2d 560 (1989), *reaffirmed*, 884 F.2d 709 (3d Cir.1989) (*SEPTA*). If federal or state regulations and statutes cannot force employees to be tested in the absence of reasonable circumstances, there is no principled reason to find, as the majority does, that a union whose authority derives from statutes has actual authority to waive the constitutional rights of its members by "contractually" binding them to unreasonable searches and seizures.

The rigorous, independent inquiry into whether there has been an unreasonable search or seizure under the Fourth Amendment, or a voluntary consent or waiver to a search, should not be reduced to legal doctrines and theories governing collective bargaining. The majority seems to believe that the scope and nature of Fourth Amendment rights would depend on the legal framework of labor law, especially the "fair representation" doctrine. I reject that importation into Fourth Amendment jurisprudence. The contours of the Fourth Amendment cannot be molded by a union to its utilitarian concept of fairness.

I suspect the majority's conclusions are driven by "slippery slope" considerations: specifically, that federal courts might be inundated with suits by disgruntled public

sector employees alleging that their collective bargaining, arbitration and settlement proceedings did not adequately protect their constitutional rights. The majority writes: "If individual public employees may litigate such questions despite the resolution reached through collective bargaining, the utility of collective bargaining with respect to drug testing in the public section would be greatly diminished." Majority Opinion 828. But if "the utility of collective bargaining" is bought at the expense of individual rights, it is bought with too high a price.

Indeed, in similar circumstances, the Supreme Court has said so. See Alexander v. Gardner–Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 1023, 39 L.Ed.2d 147 (1974) ("The court of appeals also thought that to permit a later resort to the judicial forum would undermine substantially the employer's incentive to arbitrate and would 'sound the death knell for arbitration clauses in labor contracts.' Again, we disagree."). Moreover, I fear the solution here espoused by the majority has not been carefully weighed and the evils that follow will surely exceed those it seeks to cure. I believe disputes as to whether government in its capacity as an employer violated the Fourth Amendment should not be resolved by union grievance and arbitration proceedings: They are best resolved in federal courts. See 94 S.Ct. at 1024 ("the resolution of statutory or constitutional issues is a primary responsibility of courts"); McDonald, 104 S.Ct. at 1803 ("although arbitration is well suited to resolving contractual disputes ... it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard"). While the mistrust of arbitration and similar proceedings have been assuaged somewhat, see Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985), there can be no question that federal courts are the best forum to resolve § 1983 and constitutional claims. See Patsy v. Florida Bd. of Regents, 457 U.S. 496, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172 (1982).

I would hold that absent an express authorization by a union member, a union never possesses actual authority to waive the Fourth Amendment rights of its members. The Supreme Court's opinion in Alexander, which the majority ignores, compels this result.

In Alexander, the Supreme Court held that an employee's statutory right to a trial de novo under Title VII may not be foreclosed by submitting his claim to final arbitration under the nondiscrimination clause of a collective bargaining agreement, even though that agreement provided that the arbitrator's decision was to be "final and binding upon the Company, and Union, and any employee or employees involved." 94 S.Ct. at 1025. The Court stressed that an employee's contractual rights under a collective bargaining agreement are distinct from his Title VII statutory rights:

In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. *The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence....*

Moreover, a contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination. *Both rights have legally independent origins* and are equally available to the aggrieved employee.

94 S.Ct. at 1020, 1022 (emphasis added).

Thus, in Alexander, the Court distinguished between a union member's contractual rights and obligations arising from a collective bargaining agreement, and his constitutional and statutory rights that exist independently of his union status. The Court reasoned that certain statutory rights may not be abridged in collective bargaining, or by an arbitration proceeding mandated by a union contract. It then

declared what rights of its members a union can contractually waive:

> It is true, of course, that a union, may waive certain statutory rights related to collective activity, such as the right to strike. These rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities.... In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver.

94 S.Ct. at 1021 (citations omitted).[3]

Thus an employee may waive his cause of action under Title VII, but a union cannot. 94 S.Ct. at 1021. This follows because "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit [and] harmony of interest between the union and the individual employee cannot always be presumed." 94 S.Ct. at 1024 n. 19.[4]

*Alexander* makes clear that TWU cannot waive Bolden's constitutional rights. In *Alexander*, the employee's right arose from Title VII; here Bolden's right arises from § 1983 and the Fourth and Fourteenth Amendments. In *Alexander*, express provisions in the collective bargaining agreement provided that the employer shall not discriminate, that discrimination claims shall be arbitrated, and that the arbitrator's decision shall be "final and binding" on the employee: Here the collective bargaining agreement between TWU and SEPTA did not even permit drug testing. In *Alexander*, the employee permitted the union to pursue arbitration; here Bolden seasonably, persistently and unequivocally rejected TWU's offer to pursue grievance proceedings. In *Alexander*, the employee did not seek review of the arbitrator's decision, but asserted a statutory right independent of the arbitration process, 94 S.Ct. at 1022; here Bolden does not seek review of TWU's actions as it pertains to the fair representation doctrine, but asserts an independent constitutional claim under § 1983. Yet while the Supreme Court has concluded that neither the express provisions of the collective bargaining agreement nor submitting a grievance to arbitration vitiated an employee's statutory rights, the majority concludes that TWU's waiver, despite Bolden's disapproval, in his absence, and without express provision in the collective bargaining agreement, vitiated Bolden's constitutional rights.

*If* Bolden's rights at issue here were no more than contractual entitlements arising out of collective bargaining, I would agree he is "bound" by his union's willingness to impose drug testing obligations. *See Consolidated Rail Corp. v. Railway Labor Exec. Ass'n*, 491 U.S. 299, 109 S.Ct. 2477,

---

**3.** The majority cites to these cases, among others, for the proposition that the concept of exclusive union representation not only restricts the freedom of individual employees to enter into separate employment contracts, but that concept may also result in some other restrictions that implicate individual employees' constitutional rights: *Teachers v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Ellis v. Railway Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v. State Bar of Cal.*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). These cases involve the type of issues "related to collective activity" that the *Alexander* Court discusses. When constitutional rights were implicated, the Court resolved them by applying the appropriate constitutional standards.

**4.** In *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Supreme Court held that an award in an arbitration proceeding brought under the terms of a collective bargaining agreement did not bar an employee from bringing a § 1983 action. Again the Court stressed the fundamental problem: when individual rights are at issue "the union's interests and those of the individual employee are not always identical or even compatible. As a result, the union may present the employee's grievance less vigorously, or make different strategic choices, than would the employee." 104 S.Ct. at 1803. *See Taylor v. NLRB*, 786 F.2d 1516, 1522 (11th Cir.1986) (considering "the practical reality ... in which individual rights may be negotiated away [by unions] in the interest of the collective good").

2484, 105 L.Ed.2d 250 (1989).[5] But here Bolden brought a § 1983 suit alleging that SEPTA violated rights secured for him by the Constitution, not run-of-the-mill rights gotten by agreement. If, as *Alexander* holds, a union cannot waive its members' statutory rights under Title VII, it seems clear to me a union lacks power to waive its members' Fourth Amendment rights. Like Title VII, Fourth Amendment rights are guaranteed to individuals. Unions do not have inherent actual authority to waive such constitutional rights; else individual rights would be sacrificed for some perceived collective good as unions negotiate to get economically related benefits for their members as a whole. The Bill of Rights is predicated on the notion that minority or individual rights must be protected from assault by the majority. Indeed, the Supreme Court in *Alexander* precludes the result reached by the court herein.

My view that a union cannot waive its members' Fourth Amendment rights does not undermine the utility of collective bargaining with respect to drug testing in the public sector. Nor does my view compromise public policies aimed at maintaining drug free public employees (particularly those in safety sensitive jobs). Since employees' Fourth Amendment rights to be free of *unreasonable* searches do not encompass a right to be free of *reasonable* work restrictions and conditions, these restrictions and conditions, including certain drug testing, are the proper subject of negotiation.[6] My view leaves room for a union to negotiate mandatory drug testing, albeit in a limited class of cases outside the Fourth Amendment restrictions: namely, those presenting circumstances where public employee drug testing is reasonably justified. Bolden's case is not one of these because, as the majority and I agree, Bolden did not have a safety-sensitive job and because SEPTA's return-to-work drug testing policy is unconstitutional.

Constitutional rights *can* be relinquished. But whether TWU may waive Bolden's Fourth Amendment rights is another issue. If TWU is to relinquish Bolden's Fourth Amendment rights, it must meet constitutional standards. That is, there must be a voluntary consent by the individual holding the right, *Schneckloth*, 93 S.Ct. 2041, or at least a reasonable government belief that waiver is by the possessor of the right being waived, *Rodriguez*, 110 S.Ct. 2793.

The court holds, and I agree, Bolden did not voluntarily consent to his initial drug search or to mandatory future drug searches. Nor did Bolden expressly or implicitly authorize TWU to waive his Fourth Amendment rights. Yet the majority concludes "SEPTA had reasonable grounds to believe that the union possessed the authority to consent to future drug testing of

---

5. The Court held if an employer's contractual claim to make a particular change in working conditions is arguably justified by the parties' agreement, the employer may make the change and the courts must deter to the arbitral jurisdiction of the Board. Because Conrail was a private entity, *Railway Labor Exec. Ass'n v. Consolidated Rail Corp.*, 845 F.2d 1187, 1189 (3d Cir.1988), the Supreme Court addressed the issue only with respect to contractual entitlements associated with collective bargaining. 109 S.Ct. at 2427 ("Conrail's *contractual* arguments are [not] frivolous or insubstantial") (emphasis added). *Consolidated Rail* did not address whether a union can waive in grievance or settlement proceedings an employee's constitutional rights or whether such waiver is binding in an independent § 1983 claim. In this respect, this case is inapposite.

 I also point out that in *Consolidated Rail*, Conrail required its employees to undergo physical examinations periodically and upon return to work. These examinations included drug testing. *109 S.Ct. at 2486. If* Conrail was a government employer subject to the Fourth Amendment its return-to-work drug testing policy would most likely be unconstitutional under the Supreme Court's reasoning in *Skinner. See Skinner*, 109 S.Ct. at 1417 (only where privacy interest is minimal and where an important governmental interest is furthered by the intrusion may a search be reasonable without individualized suspicion).

6. In *SEPTA*, we held that SEPTA's random drug testing program for employees with safety sensitive jobs is "constitutionally justified." 884 F.2d at 713. Because these employees did not have a Fourth Amendment right to be free of drug testing, drug testing became a matter of contractual entitlement. Relying on *Consolidated Rail*, we therefore held that the program "constitutes an issue 'arguably' covered by the implied terms of the parties' agreement as established by past practice." 884 F.2d at 713.

Bolden." It relies improvidently upon *Rodriguez* for this proposition.

The *Rodriguez* Court held that a search is reasonable under the Fourth Amendment if the government actor reasonably believed the consenting party had authority to waive the Fourth Amendment right. 110 S.Ct. at 2801. This holding is vested in the Court's interpretation of *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), which held that a hotel clerk cannot properly consent to a police search of a rented room. The *Stoner* Court said "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" 84 S.Ct. at 892. The *Rodriguez* Court interpreted *Stoner* to mean that the police in *Stoner* "could not reasonably have believed that the [hotel clerk] had general access to or *control*" over the rented room. 110 S.Ct. at 2801 (emphasis added). Thus the *Rodriguez* Court framed the Fourth Amendment third party waiver issue in terms of whether government actors reasonably believed that "the consenting party had authority over the premises." 110 S.Ct. at 2801. This emphasis on whether a consenting party was reasonably perceived to have "authority over the premises" indicates the *Rodriguez* Court's test of effective third party consent requires inquiry into whether the government actor could reasonably view the consent-giver as actually possessing the Fourth Amendment right.

*Rodriguez* then stands for the proposition that only if government actors reasonably think a consenting party actually *possesses* a Fourth Amendment right, or otherwise has valid authority to relinquish that right, does an invasive search and seizure consented to by a third party become reasonable. 110 S.Ct. at 2801 ("what is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been *waived*, but whether the right to be free of *unreasonable* searches has been *violated*") (emphasis in original).

Thus, under *Rodriguez*, the proper inquiry here is whether SEPTA reasonably thought TWU possessed, or had express authorization to waive, Bolden's Fourth Amendment rights.

Clearly, SEPTA could not have reasonably believed that TWU either shared Bolden's Fourth Amendment rights, or else had express authority to waive Bolden's rights by virtue of the union's power to represent employees. Just because Bolden agreed that a union could represent him in collective bargaining for contractual entitlements (wage, hour, benefit, and work condition terms), it does not follow that SEPTA could reasonably believe TWU had acquired Bolden's authority to waive his Fourth Amendment rights.

Indeed, before the grievance settlement was finalized, Bolden by letter to TWU and SEPTA disavowed his association with TWU in this grievance. Bolden informed SEPTA and TWU that he had retained an attorney and that "[h]e does not want your Union or any counsel retained by your Union to represent him in connection with this discharge." Bolden's letter evinces clearly the "[dis]harmony of interest between the union and [Bolden]." *See Alexander*, 94 S.Ct. at 1024 n. 19.

Furthermore, as the majority points out, the collective bargaining agreement in effect the first time SEPTA fired Bolden did not contain any drug testing provision. In light of the intensely personal Fourth Amendment right involved, Bolden's disassociation with TWU refutes any notion that TWU had authority, apparent or otherwise, to compromise Bolden's Fourth Amendment rights. It follows that it was unreasonable for SEPTA to believe that TWU could, in the course of settling Bolden's grievance, waive Bolden's constitutional rights.[7]

I believe with Justice Cardozo that "[t]he great ideals of liberty and equality are preserved ... by enshrining them in constitutions, and consecrating to the task of

---

7. In any event, the reasonableness of SEPTA's belief is a jury question. *See Rodriguez*, 110 S.Ct. at 2801 (waiver by third party is a factual determination); *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047 (consent to search is a question of fact).

their protection a body of defenders." [8] I fear that by this decision the defenders have abdicated the defense to union negotiators and relegated a right guaranteed by the Constitution to the status of a bargaining chip in a grievance settlement game. I believe a Fourth Amendment right must not be consideration or the medium of exchange for a contractual modification when the individual possessing the right chooses not to give it up but instead to stand upon it. I would hold that any waiver of constitutional rights must be subject to constitutional standards not labor laws and Bolden retains his right of action against SEPTA for violating them. I would affirm.

**8.** Cardozo, Benjamin, *The Nature of the Judicial Process* 92–94 (1921).